UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| GREATER ST. LOUIS CONSTRUCTION LABORERS WELFARE FUND, et al, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 4:14-CV-946-SPM |
| X-L CONTRACTING, INC., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This case is before the Court on those portions of Plaintiffs' Motion for Summary Judgment (Doc. 86) as to which the Court deferred ruling in its prior Memorandum and Order, as well as Defendant X-L Contracting's Motion for Leave to File a Second Amended Counterclaim (Doc. 124) and Motion for Leave to Conduct Additional Discovery (Doc. 126). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). (Doc. 11).

### I.   FACTUAL BACKGROUND

The instant lawsuit was filed by two groups of plaintiffs: (1) several employee benefit plans and their trustees (the "Benefit Funds Plaintiffs"),[1] and (2) several labor organizations (the "Union Plaintiffs")[2] (collectively, "Plaintiffs"). Defendant X-L Contracting, Inc. ("X-L") is an employer.

---

[1] The Benefit Funds Plaintiffs are Greater St. Louis Construction Laborers Welfare Fund, Construction Laborers Pension Trust of Greater St. Louis, and AGC – Eastern Missouri Laborers Joint Training Fund. The parties agree that the Benefit Funds Plaintiffs are employee benefit plans within the meaning of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 102(1), (3), 1132, & 1145.

[2] The Union Plaintiffs are Local Union Nos. 42, 53, and 110, Laborers International Union of North America, AFL-CIO. The parties agree that the Union Plaintiffs are labor organizations

During the time period relevant to this litigation, X-L and the Union Plaintiffs were signatories to two collective bargaining agreements ("CBAs"): the Site Improvement Agreement (the "Site Agreement") and the Bituminous Paving Agreement—Highway (the "BPA"). The CBAs require employers to submit monthly fringe benefit contributions to the Benefit Funds Plaintiffs, based on the hours worked by any employee who performs covered work as defined by the CBAs. A complication arises when an employee whose normal place of employment is covered by the Benefit Funds Plaintiffs performs work in another geographic area covered by different benefit funds (for example, the Construction Industry Laborers Pension and Welfare Funds, also known as the "Outstate Funds"). In such a situation, the employer makes fringe benefit contributions on that employee's behalf to the Outstate Funds instead of to the Benefit Funds Plaintiffs. Under a "Reciprocal Agreement" entered into by the Benefit Funds Plaintiffs and the Outstate Funds, an employee who wants the contributions that were made on his behalf to the Outstate Funds to be transferred to the Benefit Funds Plaintiffs may submit a transfer request form with the Outstate Funds, at which point the Outstate Funds are required to transfer any contributions received to the Benefit Funds Plaintiffs.

Both CBAs provide that the Benefit Funds Plaintiffs have the right to police the employers' self-reporting of the hours worked through a payroll examination process. The Site Agreement and the BPA both provide:

> The Employer agrees that Welfare, Pension, Training, Fund, Vacation, Supplemental Dues and LECET shall each have the right to verify the accuracy of reports and contributions made by the Employer, by having their respective employees, agents, representatives or accountants audit and examine during the Employer's regular business hours, the Employer's weekly payroll journal,

---

representing employees in an industry affecting commerce within the meaning of Sections 2(4), (5), (6), and (7) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(4), (5), (6), & (7), and Section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185.

> individual earnings records of employees, copy of Federal payroll tax returns and other payroll records as may be necessary to allow such examiner to determine whether the Employer is making full and complete reports and contributions as required by the Employer's collective bargaining agreement with the Union.

In addition, the CBAs bind the employers to the terms of trust agreements that create the Benefit Funds Plaintiffs, and those trust agreements also grant the Benefit Funds Plaintiffs the right to verify employer reporting through examination of the employer's payroll records.

In the summer of 2013, the Benefit Funds Plaintiffs sent several letters to X-L informing X-L that they had not received reports for the months of May and June 2013. Between June and November 2013, there were several telephone conversations between X-L's accountant and someone at the fringe benefit office in an attempt to resolve the issue. On November 22, 2013, the Benefit Funds Plaintiffs sent X-L a letter indicating that they had the reports for work performed under the Site Agreement but not for work performed under the BPA.

On February 25, 2014, the accountants for the Benefit Funds Plaintiffs sent a letter to X-L, requesting a payroll examination and setting forth the list of records that would be needed for the payroll examination. A dispute arose over the scope of the records that X-L was required to make available for the examination. X-L took the position that it was obligated only to provide payroll records for employees whom X-L contended were members of Laborers Locals 42-53-110 and not for other X-L employees, and that it would not provide unredacted documents. The Benefit Funds Plaintiffs took the position that, pursuant to the relevant law as established by the United States Supreme Court, they were entitled to examine records of X-L's other employees as well. On April 24, 2014, Plaintiffs' accountant went to X-L's office to perform the field work for the payroll examination, and X-L provided access only to payroll records of X-L employees who were members of Laborers Locals 42-53-110.

On May 19, 2014, Plaintiffs filed their Complaint, asserting two claims. In their first count, Plaintiffs sought (a) an interlocutory order of accounting requiring X-L to submit its books and records to an accountant selected by Plaintiffs to determine the amounts owed to Plaintiffs during the period of January 1, 2011 through March 31, 2014; (b) a judgment against X-L based upon the findings of the financial examination; (c) an order requiring X-L to submit its reports for the period of May and June 2013, along with the required contributions and liquidated damages; (d) an order requiring X-L to make payments in the future to the Benefit Funds Plaintiffs in accordance with the terms and provisions of the collective bargaining agreement, and such collective bargaining agreements as may be negotiated and executed in the future; and (e) interest, liquidated damages, costs, accounting fees, and reasonable attorney's fees pursuant to 29 U.S.C. § 1132(g). In their second count, Plaintiffs sought an injunction prohibiting X-L from performing work of a type covered by X-L's collective bargaining agreement with Laborers Locals 42-53-110 within the geographic area covered by that collective bargaining agreement until such time as X-L obtained a required surety bond or letter of credit.

On May 20, 2014, X-L was served with the Complaint. On May 21, 2014, Plaintiffs obtained a bond in the amount of $25,000 in favor of the Benefit Funds Plaintiffs. On May 30, 2014, counsel for X-L sent an email to counsel for the Benefit Funds Plaintiffs, stating that the missing May and June 2013 BPA reports had been submitted using the Site Agreement report forms and that the issue had been resolved. There appears to be no disagreement that this issue was resolved at that time.

On August 15, 2014, the Benefit Funds Plaintiffs served a request for production of documents. X-L continued to object to most of these requests on the grounds that Plaintiffs did not have a right to an audit of information related to X-L employees other than the union laborers

subject to Plaintiffs' jurisdiction. On August 29, 2014, X-L emailed Plaintiffs with self-generated spreadsheets purporting to show that X-L had paid benefits to the Benefit Funds Plaintiffs that it should instead have paid to the Outstate Funds. X-L demanded a refund of the payment. On October 29, 2014, Plaintiffs filed a motion to compel the production of the requested documents. X-L opposed the motion and made multiple requests for additional time to respond to it. Prior to the second scheduled hearing date, X-L agreed to produce numerous additional documents in response to the Plaintiffs' discovery requests, and Plaintiffs withdrew their motion to compel. X-L produced additional documents, and Plaintiffs' accountants performed a financial examination.

On December 31, 2014, X-L filed a counterclaim against Plaintiffs, seeking judgment "by the amount of the overpayment of [X-L]'s payment of contributions or 'fringe benefits' from January 1, 2010 to the present."

On April 28, 2015, after receiving additional documents from X-L, Plaintiffs' accountants produced a report showing that during the examination period (January 1, 2011, through March 31, 2014), X-L had misreported and overpaid a total of $26,728.18 to the Benefit Funds Plaintiffs, most of which should have been reported to the Outstate Funds.[3] The bulk of the misreported payments occurred in 2011 and 2012, with some in 2013 and none in 2014. For all periods in which contributions were received by the Benefit Funds Plaintiffs from X-L, the Benefit Funds Plaintiffs had provided the benefits for which the contributions were intended. For example, the

---

[3] X-L had reported and paid for 2,272.00 hours to the Benefit Funds that should have been reported to the Outstate Funds and had overpaid for an additional 186.25 hours for other reasons, for a total of 2,458.25 hours. The misreported and overpaid hours amounted to $29,460.25 in total contributions. However, because there were some months in which X-L had underpaid the Benefit Funds Plaintiffs and owed liquidated damages and interest, the total amount overpaid was $26,728.18.

amounts remitted to the Welfare Fund allowed the Welfare Fund to provide health insurance for the employee on whose behalf the contributions were received.

After a mediation between X-L and the Outstate Funds related to X-L's underpayment of the Outstate Funds, X-L paid $31,438.52 to the Outstate Funds for the period of January 1, 2010 through December 31, 2012. As part of that settlement, X-L was promised that the Outstate Funds would "process" the $31,438.52 and refund the same to the Benefit Funds Plaintiffs under the Reciprocal Agreement. X-L was told that no refund could be made to it by Plaintiffs until Plaintiffs recovered the $31,438.52 from the Outstate Funds. Between December 2015 and March 2016, the Outstate Funds remitted $28,658.87 to the Benefit Funds, representing all monies they had received in welfare and pension contributions for employees who were members of the unions who had worked for X-L during the examination period, and for whom the Outstate Funds had transfer authorizations. During this time, Plaintiffs' counsel exchanged emails with X-L's counsel about how much money was being transferred.

On March 7, 2016, X-L filed its Amended Counterclaim against Plaintiffs, which the Court has found asserted three claims: (1) that Plaintiffs breached the Site Agreement by failing to return payments of fringe benefits made based on inadvertent or immaterial error, or clerical mistake; (2) that Plaintiffs breached the Site Agreement by failing to enforce a "Reciprocal Agreement" included in the Site Agreement that requires Plaintiffs to recover fringe benefits paid to the Outstate Funds; and (3) that X-L is entitled to a return of its overpayments based on an equitable restitution theory.

On March 11, 2016, this case went to mediation. Around the time of the mediation or after the mediation, Plaintiffs informed X-L that it was the written policy of the Benefit Funds not to provide a refund of pension contributions going back more than two years from the request.

Because the bulk of the misreported payments occurred in 2011 and 2012, and the request was made in August 2014, this policy would prevent Plaintiffs from providing the bulk of the refund sought by X-L. Prior to the Court-ordered mediation in the instant action, Plaintiffs had not made X-L aware of this policy.

Plaintiffs moved for summary judgment on their Complaint and X-L's Amended Counterclaims. In an earlier Memorandum and Order, the Court denied the motion as moot with regard to the claims in Plaintiffs' Complaint; granted the motion with regard to X-L's counterclaim asserting that Plaintiffs breached the Site Agreement by failing to return mistaken payments; and granted the motion with regard to X-L's counterclaim asserting that the Benefit Funds Plaintiffs breached the Site Agreement by failing to enforce the Reciprocal Agreement. The Court found that additional briefing was required with regard to the two remaining claims: X-L's counterclaim asserting that the Union Plaintiffs breached the Site Agreement by failing to enforce the Reciprocal Agreement, and X-L's counterclaim for equitable restitution. That supplemental briefing has now been received, and the Court will address the remaining portions of Plaintiffs' motion. The Court will also address X-L's motion for leave to file a second amended counterclaim, X-L's motion to conduct additional discovery, and Plaintiffs' request for attorney's fees.

## II.    LEGAL STANDARD

The Court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the

initial responsibility of informing the court of the basis of its motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this initial burden, the nonmoving party must then set forth affirmative evidence from which a jury might return a verdict in his or her favor. *Anderson*, 477 U.S. at 256-57. The nonmoving party "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007).

## III.   DISCUSSION

### A.   Plaintiffs' Motion for Summary Judgment on X-L's Amended Counterclaims

In the Court's prior Memorandum and Order dated June 22, 2016, this Court deferred ruling on Plaintiffs' motion for summary judgment as to two of X-L's counterclaims. The Court will now address Plaintiffs' motion for summary judgment as to those claims.

#### 1.   *Breach of the Site Agreement Based on Failure to Enforce the Reciprocal Agreement*

In Count II of its Amended Counterclaim, X-L alleges that Plaintiffs have breached the Site Agreement by failing to enforce their Reciprocal Agreement with the Outstate Funds and thereby recover fringe benefits paid by X-L to the Outstate Funds. The Court has already granted summary judgment in favor of the Benefit Funds Plaintiffs on this claim. The Court now addresses the Union Plaintiffs' contention that they are also entitled to summary judgment.

X-L's position in its Amended Counterclaim is that the Union Plaintiffs breached the Site Agreement by failing to enforce the Reciprocal Agreement. To prevail on a claim for breach of a

collective bargaining agreement, which is essentially a breach of contract claim, a plaintiff must demonstrate "(1) a contract between the plaintiff and defendant; (2) rights of the plaintiff and obligations of the defendant under the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Erler v. Graham Packaging*, No. 4:14-CV-931 (JCH), 2014 WL 6463338, at *3 (E.D. Mo. Nov. 17, 2014) (quoting *Amburgy v. Express Scripts, Inc.*, 671 F. Supp. 2d 1046, 1055 (E.D. Mo. 2009)). The undisputed evidence shows that X-L cannot establish the second element of this claim, because it cannot show that the Site Agreement obligated the Union Plaintiffs to enforce the Reciprocal Agreement. As Plaintiffs point out, the Site Agreement makes no reference to the Reciprocal Agreement and imposes no obligations on the Union Plaintiffs (or anyone else) to enforce the Reciprocal Agreement. *See* Site Agreement, Doc. 87-1, at pp. 9-65. Although X-L asserts that it signed the Site Agreement with the Union Plaintiffs "knowing that Plaintiffs and [the Outstate Funds] had previously signed a Reciprocal Agreement," that knowledge does not insert any contractual obligations into the Site Agreement. In addition, X-L offers no explanation of how the Union Plaintiffs could have been obligated to enforce the Reciprocal Agreement, given that they were not parties to the Reciprocal Agreement. Thus, the Union Plaintiffs are entitled to summary judgment on X-L's claim that they breached the Site Agreement by failing to enforce the Reciprocal Agreement.

In its brief, X-L appears to suggest that its claim may be one for breach of the Reciprocal Agreement itself. Plaintiffs argue that they are entitled to summary judgment on this claim, because X-L lacks standing to sue for a breach of the Reciprocal Agreement. Under Missouri law,

> Only parties to a contract and any third-party beneficiaries of a contract have standing to enforce that contract. To be bound as a third-party beneficiary, the terms of the contract must clearly express intent to benefit that party or an identifiable class of which the party is a member. In cases where the contract lacks an express declaration of that intent, there is a strong presumption that the third party is not a

beneficiary and that the parties contracted to benefit only themselves. Furthermore, a mere incidental benefit to the third party is insufficient to bind that party.

*Torres v. Simpatico, Inc.*, 781 F.3d 963, 971 (8th Cir. 2015) (quoting *Verni v. Cleveland Chiropractic Coll.*, 212 S.W.3d 150, 153 (Mo. 2007) (quotations and citations omitted)). It is undisputed that X-L is not a party to the Reciprocal Agreement, which was entered into between the Benefit Funds Plaintiffs and the Outstate Funds. *See* Reciprocal Agreement, Doc. 87-8, at pp. 5-9. X-L argues that it is a third-party beneficiary of the Reciprocal Agreement. However, the undisputed evidence establishes that it is not, because the Reciprocal Agreement does not "clearly express intent to benefit" X-L or any identifiable class of which X-L is a member. By its plain terms, the Reciprocal Agreement indicates that it is intended to benefit *employees*, not employers:

> [Plaintiff Benefit Funds and the Outstate Funds] recognize that employees who normally participate in each set of funds from time to time also perform work within the geographic jurisdiction covered by the other set of funds. In those circumstances, the employers contribute to Guest Funds for such employees. **In order to prevent such employees from losing coverage under their Home Welfare Funds and in order to provide such employees with continuous vesting and pension credits under a single pension plan,** the Trustees of both sets of funds have agreed to permit covered employees in each set of funds who temporarily work within the geographic jurisdiction covered by the other set of funds to request that contributions made by their employers be transferred from the Guest Funds back to the Home Funds.

*Id.* at p. 5 (emphasis added). This language clearly shows an intent to benefit employees, and it shows no express or implied intent to benefit employers. The fact that the intent of the Reciprocal Agreement is solely to benefit these employees is further supported by language in the agreement showing that the employees have sole control over whether to request such transfers: "When an employee is working in the geographic jurisdiction of the Guest Funds, he *may* request that contributions employers make on his behalf to those Guest Funds be transferred back to his Home Funds." *Id.* (emphasis added).

- 10 -

X-L argues that the Reciprocal Agreement "clearly intends to render a benefit to employers (X-L), by providing the very mechanism for their employees to enjoy and qualify for fringe benefits such as health insurance with continuous vesting and pension credits in order that employers (such as X-L) can hire and maintain quality employees." X-L's Supp. Mem. Opp'n, Doc. 122, at p. 20. However, the terms of the agreement make no reference to an intent to ensure that employers can hire and maintain quality employees. At most, the Reciprocal Agreement provides this as "a mere incidental benefit" to X-L—something that is plainly insufficient to render X-L a third-party beneficiary under Missouri law.

In addition, even assuming *arguendo* that X-L is a third-party beneficiary of the Reciprocal Agreement, the Union Plaintiffs are not parties to that agreement. Thus, they cannot be held liable for its breach.

For all of the above reasons, the Union Plaintiffs have established that there are no genuine issues of material fact regarding this claim and that they are entitled to judgment as a matter of law. Therefore, the Union Plaintiffs are entitled to summary judgment on Count II of X-L's Amended Counterclaim.

### 2.  Equitable Restitution

The Court next considers Plaintiffs' argument that they are entitled to summary judgment on X-L's claim for equitable restitution of its mistaken overpayments. ERISA itself permits a plan trustee to refund an employer payment that was made by a mistake of fact or law, but it does not provide a cause of action for an employer to compel such a refund. *See* 29 U.S.C. § 1103(c)(2)(A)(ii); *UIU Severance Pay Trust Fund v. Local Union No. 18-U*, 998 F.2d 509, 512-13 (7th Cir. 1993). Along with other circuits, the Eighth Circuit has crafted a cause of action for employers who have made mistaken payments, holding that "an employer has a federal common

law action for restitution of mistakenly made payments to an ERISA plan." *Young Am., Inc. v. Union Cent. Life Ins. Co.*, 101 F.3d 546, 548 (8th Cir. 1996). *Accord Greater St. Louis Constr. Laborers Welfare Fund v. Park-Mark, Inc.*, 700 F.3d 1130, 1135 (8th Cir. 2012). *See also UIU Severance Pay Trust Fund*, 998 F.2d at 512-13.

Even where an employer has made payments based on a mistake, the employer is not automatically entitled to a refund. *Park-Mark*, 700 F.3d at 1135. "Rather, [the employer] must demonstrate that restitution is equitable." *Id.* The factors relevant to assessing whether restitution would be equitable include (1) whether the contributions are the sort of mistaken payments that equity demands be refunded; (2) whether the employer delayed bringing the action for so long that laches, or some other equitable defense, bars recovery; (3) whether the employer, by continuing the payments for years without apparent question, somehow ratified past payments; and (4) whether the employer can demonstrate that the party from whom it seeks payment would be unjustly enriched if recovery were denied. *Id.* (citing *UIU Severance Pay Trust Fund*, 998 F.2d at 513). In addition, "a fund's policies cannot be arbitrary and capricious, including the decision not to refund mistakenly made payments." *Id.*

X-L's position is that it is entitled to equitable restitution because has paid twice for the same hours worked: first, when it mistakenly paid $26,728.18 to the Benefit Funds Plaintiffs that it should have paid to the Outstate Funds, and second, when it paid $31,438.52 to the Outstate Funds—$28,658.87 of which was then transferred to the Benefit Funds Plaintiffs.

As a preliminary matter, the Court notes that it is undisputed that X-L's original payment to the Benefit Funds Plaintiffs instead of to the Outstate Funds was made based on a mistake and is therefore the sort of payment for which a refund is contemplated under the federal common-law

equitable restitution cause of action.[4] The Court therefore must analyze whether a refund of X-L's first mistaken payment would be equitable under the *Park-Mark* factors.

Plaintiffs appear to suggest that the Court should conduct this analysis without considering the second payment X-L made to the Outstate Funds, which was ultimately recovered by Plaintiffs. Plaintiffs argue that X-L voluntarily agreed to make this second payment to the Outstate Funds, that the employees were under no contractual obligation to request that the money be transferred to Plaintiffs, that the employees could have left the money with the Outstate Funds, and that therefore what happened to the money after X-L paid it "has nothing to do with X-L." Supp. Mem., Doc. 121, at p. 6. Plaintiffs may be correct that X-L has no contractual right to recover this money. However, the Court is assessing an *equitable* claim, not a contractual one. In weighing the equities of the situation here, it would be nonsensical for the Court to ignore the fact that X-L has paid twice for one set of employee hours worked, and Plaintiffs have received payments twice for one set of employee hours worked. Thus, the Court finds it appropriate to consider the second payment in conjunction with all of the facts in conducting its analysis of whether restitution is equitable under the *Park-Mark* factors.

### a. Whether the employer contributions are the sort of mistaken payments that equity demands be refunded

Plaintiffs argue that the first *Park-Mark* factor favors them because X-L's mistaken payments were used to purchase benefits for employees. X-L argues that the cases relied on by Plaintiffs are inapposite here in light of the second payment X-L made (and Plaintiffs received) for the same hours. X-L has the better argument.

---

[4] Plaintiffs argue that the second payment—the payment to the Outstate Funds that was ultimately recovered by the Benefit Funds Plaintiffs—is *not* the type of payment that would, standing alone, be subject to an equitable restitution action. The Court tends to agree; however, in light of its analysis of the first payment, it need not decide this question.

As Plaintiffs point out, courts have found that the fact that an overpayment was used to obtain benefits for employees weighs against a finding that the payments are the sort that equity demands be refunded. *See Park-Mark*, 700 F.3d at 1136 (considering the fact that all of the employer's contributions, including overpayments, had benefited the employer's employees in finding that this factor favored the funds); *Alaska Trowel Trades Pension Fund. v. Lopshire*, 103 F.3d 881, 885 (9th Cir. 1996) (finding no equitable restitution was appropriate and reasoning in part that the employees had received the benefits for which the employer made contributions); *Constr. Indus. Ret. Fund v. Kasper Trucking, Inc.*, 10 F.3d 465, 466 (7th Cir. 1993) (finding no equitable restitution was appropriate and reasoning in part that the mistaken employer payments had been used to provide insurance benefits for the employees).

As X-L points out, however, this case does not fit well within the framework of the above cases. Those cases did not involve a situation in which, after receiving a mistaken payment and using it to pay for employee benefits, the fund received a *second* payment made by the employer for the same set of hours. The Benefit Funds Plaintiffs' receipt of such a second payment here makes it far more equitable for them to refund the original, mistaken payment.

Other factors also distinguish some of the cases relied on by Plaintiffs from the instant case. In *Park Mark*, the court found it significant that the mistaken payments at issue were *overpayments*. It noted that "[o]verpayments may be tied to higher pension and welfare benefits for the defendant's employees" and that "an employer may receive an immediate benefit because the greater pension and welfare benefits reduce the employees' demands for higher wages." 700 F.3d at 1136 (quotation marks omitted). In finding that this factor weighed against restitution, it noted that "the Funds presented evidence that Park-Mark's employees received insurance-coverage benefits and pension benefits reflecting the greater overpayments made by Park-Mark."

*Id.  See also Operating Eng'r's Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*., 258 F.3d 645, 651-52 (7th Cir. 2001)) ("The higher contributions . . .  were tied to higher pension and welfare benefits for the defendant's employees. This was a benefit to the defendant, since the greater the pension and welfare benefits the employees received, the less the employees were likely to demand in the way of wages."). Here, in contrast, Plaintiffs have produced no evidence that X-L made any overpayments or that any mistaken payments were tied to any greater benefits for X-L's employees, such that X-L's employees were less likely to demand higher wages. Thus, Plaintiffs have not presented evidence that X-L received a benefit from the mistaken payment that it would not have received had it made the correct payment. Instead, it appears that X-L simply made payments to the wrong entity—a mistake from which it did not receive a benefit.

In addition, in *Park-Mark*, the court found it significant that the funds had presented evidence that refunding the overpayments "would adversely affect *Park-Mark*'s employees." *Park-Mark*, 700 F.3d at 1136. Here, in contrast, Plaintiffs have not presented evidence that refunding the mistaken payment would adversely affect X-L's employees. Plaintiffs have presented a Supplemental Affidavit from Ron D. Graves stating that "[w]hen the Pension Trust refunds mistakenly paid contributions to an employer, the Pension Trust takes away the pension credit that the participant had been given as a result of those contributions, thus potentially impacting the participant's entitlement to the pension benefit. In addition, the dollar amount of the contributions refunded is deducted from the participant's total contributions, thus potentially impacting the dollar amount of the participant's benefit at retirement." *See* Doc. 123-1, ¶ 5. However, Plaintiffs have not presented any evidence that such deductions or "potential" impacts on employees would actually occur if a refund were given in this case—particularly given that the fund has received two sets of payments for the same employees and hours. Moreover, even

assuming *arguendo* that refunding money used for pension contributions would have an adverse impact on employees, Plaintiffs have not established that refunding money paid for benefits other than pension contributions would have any adverse impact on X-L's employees.

In light of the fact that X-L made payments to Plaintiffs based on a mistake, the absence of evidence that X-L received any benefit from the mistaken payments that it would not have received had it made the payments correctly, the absence of evidence that X-L's employees would be adversely impacted by a refund of the payments, and the undisputed fact that Plaintiffs have now been paid twice for the same employees and hours, the Court finds on the current record that X-L's first payment to Plaintiffs is the sort of mistaken payment that equity demands be refunded. This factor weighs in favor of X-L.

### b.  Whether the employer delayed bringing the action for so long that laches, or some other equitable defense, bars recovery

Plaintiffs argue that laches applies here, because X-L unreasonably delayed bringing its claim for restitution. "Laches applies when a claimant inexcusably delays in asserting its claim and thereby unduly prejudices the party against whom the claim ultimately is asserted." *Park-Mark*, 700 F.3d at 1136 (quoting *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999)). Plaintiffs rely on *Park-Mark*, in which the court found that this factor weighed against restitution where the employer began making payments in 2004 but did not discover the mistake until 2010, reasoning that the collective bargaining agreement outlined how payments should be made and that the delay "prejudiced the Funds who are placed in the position of attempting to unwind six years of payments by trying to calculate whether Park-Mark's employees truly received benefits from the payments." 700 F.3d at 1136-37. Plaintiffs argue that here, similarly, X-L made payments from 2010 to 2014 and did not discover the mistaken

payments until 2014, despite the fact that the collective bargaining agreements clearly outlined how payments should be made.

X-L argues that *Park-Mark* is distinguishable. Unlike the funds in *Park-Mark*, Plaintiffs have not presented any argument as to how they have been prejudiced by the delay here. In its brief, X-L points out that because Plaintiffs are in receipt of two sets of payments, it does not appear that Plaintiffs would have to "attempt to unwind" several years of payments in order to make a refund to X-L. Plaintiffs provide no response to this argument.

While there was a significant delay in discovering the mistaken payments here, the receipt of a second payment makes this case distinguishable from *Park-Mark*. The Court also notes that the four years of mistaken payments here involved a somewhat smaller delay than was found in *Park-Mark*. Thus, the Court finds that this factor weighs in favor of neither party.

### c. Whether the employer delayed bringing the action for so long that laches, or some other equitable defense, bars recovery

Plaintiffs argue that this factor favors neither side, again relying on *Park-Mark*. *See id.* at 700 F.3d at 1137 (finding that this factor favored neither side because although the employer had authorized the overpayments at issue, it did so based on a mistake of law or fact). The Court agrees.

### d. Whether the employer can demonstrate that the party from whom it seeks payment would be unjustly enriched if recovery were denied

With regard to the fourth factor, Plaintiffs argue that they would not be unjustly enriched if recovery were denied, because at the time they made the decision not to refund the first payment, they had used the money to pay for benefits for X-L's employees and had not received a second payment. Plaintiffs acknowledge that they subsequently did receive a second payment, but they argue that that payment should not be considered in assessing whether they were unjustly enriched.

Plaintiffs may be correct that as of the time they made the initial decision not to refund the payment, they had not been unjustly enriched. However, Plaintiffs provide no authority supporting the proposition that in evaluating an equitable restitution claim, the Court must limit its unjust enrichment analysis to the facts as they stood at the moment Plaintiffs first refused to refund the overpayment. As discussed above, the Court cannot reasonably consider the equities of the situation without considering the fact that Plaintiffs have now been paid twice for the same set of employee hours worked, and that X-L has paid twice for those same hours. Plaintiffs have not demonstrated that the payments received, considered *in toto*, do not constitute a windfall. When all of these facts currently in the record are considered, it appears that Plaintiffs have received a windfall, while X-L has been significantly disadvantaged. Thus, it would be unjust to permit Plaintiffs to retain the windfall while permitting X-L to continue to suffer the disadvantage.

For all of the above reasons, the Court finds that on the current record, the *Park-Mark* factors favor an award of equitable restitution.[5] Thus, Plaintiffs have not established that they are entitled to summary judgment on X-L's equitable restitution claim.

## B.  X-L's Motion to File a Second Amended Counterclaim

The Court next considers X-L's Motion for Leave to File a Second Amended Counterclaim. The Court's most recent order addressing amendment of claims gave X-L until March 7, 2016 to amend its counterclaims, so X-L must show "good cause" for amending its pleading now. *See Sherman v. Winco Fireworks Inc.*, 532 F.3d 709, 716 (8th Cir. 2008). X-L seeks

---

[5] Because the Court finds that these factors favor equitable restitution, the Court need not address the parties' disputes over whether Plaintiffs' policy containing a two-year limit on refunds is arbitrary and capricious. The Court also need not resolve the parties' dispute over whether that policy was in effect at the time of Plaintiffs' decision here. Assuming, *arguendo*, that the policy was applicable during the relevant time frame and is not arbitrary and capricious, Plaintiffs have still failed to establish that they are entitled to summary judgment on X-L's equitable restitution claim.

- 18 -

to amend its counterclaim to include a claim against Plaintiffs for restitution. However, the Court has already held that X-L has adequately alleged a claim for equitable restitution in its existing Amended Counterclaim, and X-L has not explained why that is insufficient or why it needs to file a new claim at this late date. Thus, this motion will be denied.

### C.  X-L's Motion for Leave to Conduct Additional Discovery

X-L has also filed a motion for leave to conduct additional discovery to determine the itemized source of the $28,658.87 Plaintiffs recovered from the Outstate Funds, the facts and circumstances regarding Plaintiffs' policy limiting refunds to contributions made less than two years prior to the request, and the plan administrator's intentions with respect to X-L's request for a refund. X-L has not shown good cause to reopen discovery regarding these matters. X-L has not explained how an itemization of the sources of the money obtained from the Outstate Funds would be relevant to any of its claims. The plan administrator's intentions and plans with respect to X-L's request for a refund are apparent from the parties' summary judgment filings, and X-L has not shown that a deposition of the plan administrator would yield any additional relevant facts. Similarly, X-L has not shown how obtaining additional facts regarding the adoption of the refund policy would affect the Courts' resolution of any of the claims at issue in this case. Thus, this motion will be denied.

### D.  Plaintiffs' Request for Attorney's Fees

This Court next turns to Plaintiffs' request for an award of attorney's fees and costs under ERISA Section 502(g), 29 U.S.C. § 1132(g), which Plaintiffs made as part of their original summary judgment motion. Plaintiffs argue that they are entitled to attorney's fees because they obtained all of the relief sought in their Complaint—albeit without any substantive rulings from this Court. In a prior order, the Court dismissed the claims in Plaintiffs' Complaint as moot because

Plaintiffs represented that they had obtained all of the relief they sought, but the Court retained jurisdiction to decide the question of whether Plaintiffs are entitled to attorney's fees and costs.

Section 502(g)(1) of ERISA states, "In any action under this subchapter . . . by a participant, beneficiary or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). Although Plaintiffs argue that they are entitled to an award of attorney's fees and costs because they are "prevailing parties," that is not the correct standard. The Supreme Court has held that "a fee claimant need not be a 'prevailing party' to be eligible for an attorney's fees award under § 1132(g)(1)." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252 (2010). Rather, the applicable standard is that "a fees claimant must show 'some degree of success on the merits' before a court may award attorney's fees under § 1132(g)(1)." *Id.* at 255. "A claimant does not satisfy that requirement by achieving 'trivial success on the merits' or a 'purely procedural victor[y],' but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a 'lengthy inquir[y] into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'" *Id.* (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, at 688 n.9 (1983)).

The Court finds that Plaintiffs have achieved some degree of success on the merits of the claims in their Complaint. In their Complaint, Plaintiffs sought, *inter alia*, an order requiring X-L to submit its books and records for the period from January 2011 through March 2014, an order requiring X-L to submit reports for May and June 2013, and an order requiring X-L to obtain a surety bond or letter of credit required by an applicable collective bargaining agreement. Although X-L eventually submitted its books and records to Plaintiffs, resolved the issue of the reports for May and June 2013, and obtained the required bond, the record shows that X-L did not do these things until Plaintiffs filed a lawsuit and a motion to compel. Courts within the Eighth Circuit and

elsewhere have found that an award of attorney's fees in an ERISA case may be proper when a plaintiff's suit operated as a catalyst to bring about a voluntary change in the defendant's conduct. *See Boyle v. Int'l Bhd. of Teamsters Local 863 Welfare Fund*, 579 F. App'x 72, 77-78 (3d Cir. 2014)  (concluding that the plaintiffs had achieved some success on the merits and could receive an award of attorney's fees under the catalyst theory where the defendants voluntarily reinstated the plaintiffs' benefits but did so only after the plaintiffs filed suit); *Broadbent v. Citigroup Long Term Disability Plan*, No. CIV 13-4081-LLP, 2015 WL 1189565, at *4-*5 (D.S.D. Mar. 16, 2015) (finding that the plaintiff had achieved some degree of success on the merits where the lawsuit "served as a catalyst to cause [the defendant] to provide her with substantially all of the relief she sought in her complaint"); *Greenwald v. Liberty Life Assurance Co.*, No. 4:12-CV-3034, 2013 WL 3716416, at *3 (D. Neb. July 12, 2013) (adopting theory that a plaintiff can obtain fees under ERISA under the catalyst theory even though the litigation did not result in a favorable judgment, if "the pressure of the lawsuit was a material contributing factor in bringing about extrajudicial relief"; reasoning in part that "an award of attorney fees under § 1132(g) does not require the fee claimant to achieve prevailing party status" and that "ERISA is remedial legislation, and should be interpreted to advance Congress' goals of protecting employee rights and securing effective access to federal courts") (internal quotation marks omitted).

X-L's suggestion that Plaintiffs are not entitled to an award of attorney's fees because they did not obtain every document and piece of information they sought is without merit. Plaintiffs do not need to show that they obtained every piece of relief sought in their Complaint, but only that they achieved "some degree of success on the merits." That standard is satisfied by the evidence showing that by filing the lawsuit and litigating the motion to compel, Plaintiffs obtained documents that X-L had previously been unwilling to produce and that Plaintiffs needed to conduct

their payroll examination. X-L's suggestion that Plaintiffs are not entitled to an award of fees because the documents produced ultimately showed that X-L made overpayments rather than underpayments is also without merit. As Plaintiffs point out, their right under the CBAs to police the employers' self-reporting of the hours worked through a payroll examination process and to verify employer reporting through examination of the employer's payroll records exists independent of whether the examination reveals underpayment, overpayment, or proper payment. They achieved success in their attempt to enforce that right.

Once the threshold of "some degree of success on the merits" is met, "a court in exercising its discretion may then consider factors such as (1) degree of culpability or bad faith, (2) ability to satisfy an award of attorney's fees, (3) potential for deterring other persons acting under similar circumstances, (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself, and (5) the relative merits of the parties' positions." *In re Interstate Bakeries Corp.*, 704 F.3d 528, 537-38 (8th Cir. 2013). *Accord Lawrence v. Westerhaus*, 749 F.2d 494, 495-96 (8th Cir. 1984).

After consideration of these factors, the Court finds that a limited award of attorney's fees is appropriate in this case. First, although the record does not necessarily establish bad faith, it does suggest that X-L was somewhat culpable in its repeated refusal to provide Plaintiffs with the documents they needed to perform an audit, particularly in light of Plaintiffs' having informed them of relevant Supreme Court case law supporting the position that Plaintiffs were entitled to the documents sought. Only after Plaintiffs filed a lawsuit and a motion to compel (and after X-L requested several continuations of the hearing on the motion) did X-L ultimately produce most of the required documents. Second, there is no indication that X-L cannot afford to satisfy an award of attorney's fees. Third, an award of fees here may serve to deter future employers from

- 22 -

withholding required documentation sought in an audit. Fourth, the filing of Plaintiffs' complaint did seek to benefit all participants in an ERISA plan, because the purpose of the audit is to ensure that the funds received the correct amount of contributions needed to fund benefits. Fifth, Plaintiffs' legal position that they were entitled to the documents at issue was better supported by the law than was X-L's position that it was not. *See Southeast and Southwest Areas Pension Fund v. Central Transp., Inc.*, 472 U.S. 559 (1985).

For the above reasons, Plaintiffs are entitled to an award of the reasonable attorney's fees associated with their attempts to obtain the relief sought in their Complaint. However, once Plaintiffs obtained the relief sought in their Complaint, Plaintiffs' ERISA claims became moot, and Plaintiffs could have filed a motion to dismiss their claims and requested an award of attorney's fees from the Court. Plaintiffs are not entitled to an award of fees for attorney hours worked after that date, other than those specifically related to Plaintiffs' request for attorney's fees from the Court. Plaintiffs may obtain reasonable fees related to preparing the portion of Plaintiffs' motion for summary judgment that relates to its own claims, which was in substance a motion for attorney's fees rather than a motion for summary judgment. However, Plaintiffs may not obtain fees related to Plaintiffs' efforts to deal with X-L's request for a refund, Plaintiffs' efforts to work with the Outstate Funds or X-L regarding X-L's payments to the Outstate Funds, or Plaintiffs' work related to the transfer of funds from the Outstate Funds to Plaintiffs. Plaintiffs also may not obtain any fees related to X-L's counterclaims or other motions.

For the above reasons, Plaintiffs' request for attorney's fees and costs will be granted to the extent that Plaintiffs are seeking attorney's fees for work performed in obtaining the relief sought in their Complaint, and denied to the extent that Plaintiffs are seeking attorney's fees related to other matters. Plaintiffs have not submitted sufficient evidence for the Court to determine the

amount of the attorney's fees to which they are entitled. They submitted an affidavit stating that they have incurred fees in the amount of $28,861.00 and have incurred costs in the amount of $491.64, and they seek a total award of $29,352.64 in fees and costs. They state that the fees sought include fees for client conferences, telephone calls and correspondence with X-L, drafting their complaint, file review, responses to X-L's motions and counterclaims, drafting a motion to compel discovery, preparing for and attending mediations, conferences with Plaintiffs' accountants, attending court hearings, and drafting a motion for summary judgment. There is no itemization of the number of hours Plaintiffs' attorneys spent on any particular task. Thus, the Court cannot determine what portion of the fee award requested relates to Plaintiffs' efforts to obtain the relief sought in their Complaint (as opposed to X-L's Counterclaim or other matters), nor can the Court determine whether the number of hours spent on any particular task was reasonable in light of the work performed. At the next scheduling conference, the Court will discuss with the parties the appropriate timing and format of the presentation of such evidence and any related legal arguments.

## IV.   CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 86) is **GRANTED IN PART** and **DENIED IN PART**. With respect to X-L's counterclaim asserting that Plaintiffs breached the Site Agreement or the Reciprocal Agreement by failing to enforce the Reciprocal Agreement, the motion is **GRANTED**. With respect to X-L's counterclaim for equitable restitution, the motion is **DENIED.**

**IT IS FURTHER ORDERED that** X-L's Motion for Leave to File a Second Amended Counterclaim (Doc. 124) is **DENIED**.

**IT IS FURTHER ORDERED** that X-L's Motion for Leave to Conduct Additional Discovery (Doc. 126) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' request for attorney's fees and costs is **GRANTED IN PART and DENIED IN PART**. With respect to reasonable fees and costs related to Plaintiffs' attempts to obtain the relief sought in their Complaint, and reasonable fees and costs related to Plaintiffs' request for fees from this Court, the request is **GRANTED**. With respect to fees related to other matters, the request is **DENIED**. The Court reserves ruling on the question of the amount of attorney's fees to which Plaintiffs are entitled.

**IT IS FURTHER ORDERED** that X-L's Motion to Amend Case Management Order (Doc. 108) and X-L's and Motion for Additional Time to Amend Scheduling Order (Doc. 117) are **DENIED** as moot in light of this Court's prior order vacating the trial date.

**IT IS FURTHER ORDERED** that counsel for the parties shall appear at a scheduling conference on **Thursday, November 17, 2016, at 10:00 a.m.**, to discuss a new trial date, the presentation of further evidence regarding attorney's fees, and any other issues remaining in the case.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of October, 2016.